UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES LANDRUM JONES,<br><br>   Petitioner,<br><br> v.<br><br>JAMES YATES, warden,<br><br>   Respondent.<br>_____ / | No. C 05-2536 MHP (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

James Landrum Jones, a prisoner currently incarcerated at the Pleasant Valley State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A.  The Crime

Michael Blanton was a homeless man in Santa Cruz County who had the distinctive physical feature that he had only one hand. His body was found in bushes near a campsite in Santa Cruz County on February 22, 2002 by the Santa Cruz police. Police officers had been led to site by Tia Hitt, who told them that she and her boyfriend, James Landrum Jones, had killed Blanton about 1-1/2 weeks earlier. Her version was that Jones had done the killing, although she had provided some limited assistance. Like Blanton, Hitt and Jones were homeless.

1    According to Hitt, Blanton had come into their campsite at about 4:00 or 4:30 a.m.
2 making noise.  Jones exited the tent he and Hitt were sleeping in, and told Blanton to leave
3 the campsite.  Blanton thought the campsite was his and said something about contacting the
4 police as he began to leave the campsite.  As Blanton was leaving, Jones blocked him and
5 said he would not leave the campsite alive.  Jones and Hitt hit Blanton with some walking
6 sticks and Blanton fell to the ground.  Jones kicked Blanton (as did Hitt) while he was on the
7 ground.  Jones then tried to strangle Blanton with his hands while asking Hitt to find his
8 knife so he could use it on Blanton.  Hitt did not find the knife and instead offered up a
9 bicycle lock chain – referred to by the parties as a "smiley."[1]  Jones used the chain to strangle
10 Blanton.  Then Jones picked up a large rock and dropped it on Blanton's head twice, crushing
11 his skull.  After the killing, Jones dragged the body into the bushes.

12    Hitt initially offered the information about the killing in an effort to try to avoid
13 incarceration on another charge for which she had been arrested.  Specifically, police were
14 talking to Hitt about allegations made by a 14-year old runaway named Matthew that he had
15 been raped by Hitt and Jones.  Hitt was extremely interested in avoiding further jail time, and
16 eventually mentioned the dead body and later took police to the site of the dead body.  She
17 gave lengthy statements to police describing the killing of Blanton.  See CT 775-1042.

18    Jones confessed to police that he had killed Blanton.  His confession was given after
19 he received an incomplete Miranda warning.  Jones also had told people on the street,
20 including a runaway teenager and another homeless man, that he or he and Hitt had killed
21 someone.

22 B.    Procedural History

23    Jones and Hitt initially were charged together, but the trial court later severed their
24 cases in April 2003.  Hitt entered into a plea agreement in July 2003.  She pled guilty to
25 manslaughter and various other offenses (including possession of a deadly weapon (viz., the
26 chain) and unlawful sexual intercourse with a minor).  The plea agreement called for her to
27 testify truthfully and completely against Jones and for her to receive a substantial prison
28 sentence of no more than 24 years and 4 months after Jones' trial.

2

Jones moved in limine to exclude statements he had made to police on the ground that he had not received a proper Miranda warning. The court denied the motion.

The prosecution moved in limine to admit the statements that Matthew, a 14-year old runaway, had made to a Santa Cruz police officer and a nurse who examined him. The court tentatively granted the motion to admit the testimony regarding Matthew's statements.

After voir dire had been conducted on prospective jurors, Jones waived his right to a jury trial. A bench trial was held, at the end of which the judge found Jones guilty of first degree murder. Jones later was sentenced to 25 years to life in prison.

Jones appealed. The California Court of Appeal affirmed the conviction and the California Supreme Court denied the petition for review in 2005.

He then filed this action. The two claims in his federal habeas petition also had been raised on appeal: (1) the admission of his statements to police was improper because he was not given a proper Miranda advisement before he made them, and (2) the admission of evidence of statements made by Matthew to a police officer and a nurse violated his rights under the Confrontation Clause. The state court rejected both federal constitutional claims on the ground that any error was harmless. This court also addresses the harmlessness of the errors and therefore leaves a fuller discussion of the evidence until the discussion of the legal claims later in this order.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Cruz County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every

claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

4

**DISCUSSION**

A.   *Miranda* Claim

    1.   State Court Proceedings

Jones was first interviewed by the police on February 21, 2002. The <u>Miranda</u> warning given to Jones at that time was incomplete in that – while it did advise him of his right to remain silent and his right to counsel – it did <u>not</u> specifically advise him that he had a right to consult with counsel before questioning and to have counsel present with him during questioning.

| | |
|---|---|
| Campbell: | Well, before we talk to ya, I've got to advise you of your rights, okay? |
| Jones: | Uh . . . |
| Campbell: | You have the right to remain silent, anything you say can and will be used against you in court, you have the right to have an attorney. . . |
| Jones: | I'm under arrest then, aren't I? |
| Campbell: | . . . if you can't have an attorney, if you can't afford an attorney one will be appointed to you by the public defender's office. |
| Johnson: | You're being detained right now. Okay? |
| Campbell: | Uh . . . how long. . . |
| Johnson: | You understand those rights, okay? |
| Campbell: | You understand, understand those rights? |
| Jones: | Oh, I understand the rights. |
| Johnson: | Okay, do you have any questions about 'em? |
| Jones: | I have a lot of questions here about . . . |
| Johnson: | Okay, okay. |
| Jones: | . . . why I'm being detained. |

CT 1165. Jones thereafter gave a statement in which he incriminated himself. He also was interrogated on the next two days. At the beginning of each of those interrogations, detective Campbell reminded Jones of the earlier <u>Miranda</u> warning but did not give him a new warning. CT 1294, 1346.

The California Court of Appeal rejected the <u>Miranda</u> claim, finding that any error was

harmless.

> Here, defendant's statements were not the most compelling evidence of his guilt, and other evidence presented by the prosecution proved first degree murder beyond a reasonable doubt. The physical evidence corroborated Hitt's statements that Blanton was beat up, strangled both with hands and with a bicycle chain, and then his skull was crushed with a heavy piece of cement. Hitt also stated that even before defendant started to beat and strangle Blanton, defendant had no intention of letting Blanton live. Defendant told Hitt that he was going to kill Blanton, and defendant told Blanton that Blanton was not going to leave the campsite alive. Defendant hit and kicked Blanton and then started strangling him with his hands. When that did not kill Blanton, defendant asked Hitt for his knife so that he could cut Blanton's throat. When Hitt suggested to defendant that he use her heavy wallet chain instead of his knife, defendant took the chain and used it in an attempt to strangle Blanton. When that did not kill Blanton, defendant found and dropped a heavy piece of cement on Blanton's head, not once but twice, crushing his skull and killing him. Defendant then dragged Blanton's body into the bushes, and covered it. He later told several people about the killing, and actually showed Byers the body. The evidence that was presented by the prosecution that defendant does not contest on appeal amply supports the trial court's finding that defendant committed a deliberate and premeditated murder. . . . No reversible error is shown.

Cal. Ct. App. Opinion, pp. 15-16.

    2.    <u>Analysis</u>

<u>Miranda</u> requires that a person subjected to custodial interrogation first must be advised that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to presence of an attorney, either retained or appointed." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The discussion of the advisement of the right to counsel repeatedly is identified in <u>Miranda</u> as needing to convey that the right applies before and during interrogation. <u>See</u> <u>id.</u> at 471 ("Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation."); <u>id.</u> at 474 ("This does not mean . . . that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. "); <u>id.</u> at 479 (advisements must include "that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."). The suspect's familiarity with the criminal justice system does not matter for

6

purposes of evaluating the adequacy of the Miranda warning. Miranda, 384 U.S. at 468.

The Miranda warning given need not be "a virtual incantation of the precise language contained in the Miranda opinion." California v. Prysock, 453 U.S. 355, 355-56 (1981). Instead, Miranda requires that the advisement contain words which in substance will have "fully convey[] to [the suspect] his rights as required by Miranda." Prysock, 453 U.S. at 361. In Prysock, the Court indicated that advisements of the "right to appointed counsel linked with some future point in time after the police interrogation" had properly been found inadequate because they "did not fully advise the suspect of his right to appointed counsel before such interrogation." Id. at 360; Duckworth v. Eagan, 492 U.S. 195, 205 (1989). The advisement in Prysock was acceptable because it did not suggest any limitation on the right to presence of appointed counsel, and included reference to a right to counsel before and during questioning. See id. at 360-61; id. at 356 (advisement included the statement, "You have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during the questioning.").

In Duckworth v. Eagan, 492 U.S. 195, the Court upheld a Miranda warning that informed a suspect that an attorney would be appointed for him "'if and when you go to court'" did not render the Miranda warning inadequate. Although the suspect was told that he could not have an attorney until a future time due to unavailability, the advisement also included language that indicated that the defendant had the right to counsel before and during questioning. Specifically, the advisement stated: "You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court." Duckworth v. Eagan, 492 U.S. at 198. The warning "touched all of the bases required by Miranda," including "that he had the right to speak to an attorney before and during questioning." Id. at 203.

The most recent Miranda case considered by the U.S. Supreme Court described the advisement in a way that downplayed (but did not eliminate) the right to counsel before and

during questioning. ""[W]e laid down 'concrete constitutional guidelines for law enforcement agencies and courts to follow.' [Miranda, 384 U.S. at 442]. Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as 'Miranda rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' Id. at 479." Dickerson v. United States, 530 U.S. 428, 435 (2000).

The Ninth Circuit has twice found inadequate the use of a Miranda warning that told the suspect he had a right to counsel before questioning but omitted to tell him that he had the right to counsel during questioning. See United States v. Bland, 908 F.2d 471, 473-74 (9th Cir. 1990); United States v. Noti, 731 F.2d 610, 614 (9th Cir. 1984). These decisions relied on the fact that the right to counsel during questioning is "fundamental to the Miranda scheme." Noti, 713 F.2d at 615. Noti did, however, recognize that the Circuits were split on the question of whether the omission of the specific advisement of the right to counsel during questioning violated Miranda, and noted that the "question is a close one." Id. This case has worse facts than Bland or Noti, in that Jones was not advised of the right to counsel before or during questioning.

There was a Miranda violation here. To find otherwise would have been an unreasonable application of Miranda. (The state appellate court did not decide the question because it went directly to the harmless error analysis.) Allowing police to give an advisement that disconnects the right to counsel from the interrogation that is about to begin subverts the purpose of the Miranda warning. The usefulness of having access to counsel is of particular importance at the interrogation stage because once an un-counselled statement is given, a defendant's options might be greatly limited at trial even if he does not confess to the crime. Even though this court concludes that there was a Miranda violation, it reaches the same result as the appellate court: the error was harmless.

8

Jones argues that the state court erred in its harmless error analysis by misapplying the test under <u>Chapman v. California</u>, 386 U.S. 18 (1967). Regardless of whether the state court applied <u>Chapman</u> properly, this court applies the <u>Brecht</u> standard described in the next paragraph because the <u>Brecht</u> standard applies uniformly in all federal habeas corpus cases challenging criminal convictions under § 2254, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the <u>Chapman</u> standard. <u>Fry v. Pliler</u>, 127 S. Ct. 2321, 2328 (2007); <u>Bains v. Cambra</u>, 204 F.3d 964, 977 (9th Cir.), <u>cert. denied</u>, 531 U.S. 1037 (2000).

Under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), the habeas petitioner is not entitled to relief unless the trial error resulted in actual prejudice. Habeas relief should be granted if the admission of statements in violation of <u>Miranda</u> "'had a substantial and injurious effect or influence in determining the jury's verdict.'" <u>Jackson v. Giurbino</u>, 364 F.3d 1002, 1009 (9th Cir. 2004); <u>see, e.g.</u>, <u>Arnold v. Runnels</u>, 421 F.3d 859, 869 (9th Cir. 2005) (granting habeas relief where the prosecutor specifically emphasized in his opening statement and closing argument the petitioner's invocation of silence, which had been admitted at trial in violation of <u>Miranda</u>, and the court could not say that the evidence had no substantial influence upon the jury); <u>Jackson</u>, 364 F.3d at 1011-12 (granting habeas relief where evidence was admitted against petitioner in patent violation of <u>Miranda</u> and he suffered "substantial prejudice" as a result). Although it is subject to harmless error analysis, the court is mindful that a "confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." <u>Arizona v. Fulminante</u>, 499 U.S. 279, 296 (1991).

Under California law, a first degree murder requires willfulness, deliberation and premeditation. "Willful" means intentional. "Deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." "Premeditated" means "considered beforehand." CALJIC 8.20. There is no particular minimum amount of time an idea must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. "The true test is not the

9

duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation." Id.

The admission of evidence of Jones' statements made after an inadequate Miranda warning did not have a substantial and injurious effect on the trial judge's verdict that Jones was guilty of first degree murder. Unlike in Fulminante, Jones' confession was not the centerpiece of the prosecution's case. Jones' confession served to confirm a lot of details that the prosecution had developed through statements from other witnesses and the physical evidence. The majority of the incriminating evidence came from the statements Tia Hitt made to the police. Although Jones' statements made after the improper Miranda warning corroborated her version of the events, there was significant other corroborating evidence. In fact, because of the questions about the Miranda warning, the prosecutor specifically told the judge in her closing argument that she was "going to argue this case entirely based upon the evidence, without considering Mr. Jones' statement post-arrest in any way, 'cause my position is we make a clear first degree murder case without those statements, and I will argue it. [¶] I will then add Mr. Jones' statements, which simply push it that much farther over the top." RT 3009, 3023.

Tia Hitt provided the most significant evidence against Jones.[2] Her statements to police, which were admitted into evidence, provided the following information: Jones left the tent to investigate a noise, returned, got something and went back out. She observed Jones and Blanton arguing, with Jones telling Blanton to leave. Blanton started to leave and said something under his breath about going to the police, whereupon Jones cut in front of him and said, "you're not getting out of here alive." Jones hit Blanton and Blanton fell. Jones and Hitt hit Blanton with walking sticks, Jones kicked him, and then Jones started strangling Blanton. While strangling Blanton, Jones told Hitt to help him find his knife. Hitt went back to the tent, found the chain, emerged from the tent, held it up and said, "how about using this?" Jones said "okay," and she gave it to him, knowing Jones intended to kill Blanton. Hitt walked away. Jones wrapped the chain around Blanton's neck. After strangling him, Jones

10

picked up a rock and dropped it on Blanton's head twice. Jones invited Hitt to see what he had done, and they found it amusing that his skull had been crushed and therefore she could not have it as a souvenir. Hitt explained that she had previously told Jones that she wanted a skull to use as a candle-holder. Jones dragged the body away to hide it, and they covered it with branches and leaves. They then went to breakfast, at which time Jones bragged to Brian Byers about the killing. Although Hitt initially minimized her involvement when she spoke to police, she later admitted a greater role in anticipation of being subjected to a polygraph test, i.e., she admitted she had hit the victim more than one time and admitted that she retrieved the chain and gave it to Jones. Hitt also stated that Blanton was not the aggressor and was trying to leave when attacked.

In addition to the autopsy showing extensive injuries, there was other physical evidence: the blood-stained boot Jones threw away was found at the crime scene, Jones kept the chain with the victim's blood on it, Jones was arrested with the key to a post office box where Blanton received his mail, and Jones (with Hitt) had spent the victim's money.

Brian Byers (also known by his street name of "Flame"), testified that he was in a breakfast line with Jones and Hitt in a homeless shelter, and heard Jones bragging about their activities. Byers' friend, Jessica, was present for this conversation. Although Byers was unclear on whether Jones said "I" or "we" did the killing, there was no evidence that Jones said Hitt alone had done the killing. This bragging occurred just hours after the killing. Byers testified that Jones did most of the talking and Hitt did not disagree. Jones told Byers they had killed the victim because he was going "to rat them out" and go to the police. RT 2260, 2287.

Byers also testified that Jones invited him to see the body, and he did go to their campsite and saw the body in the bushes about 20-30 feet from their campsite. He realized who the victim was when he saw the body was missing a hand, as he was familiar with the homeless man who was missing a hand. At the campsite, Jones also said that the victim had been loud and obnoxious as a second reason for killing him. Jones talked about a chain being used in the killing, and that it had been buried because there was too much blood on it.

11

Byers also testified that Jones and Hitt talked about obtaining $1,400 from the victim's personal effects, and they (i.e., Jones, Hitt, and Byers) went to thrift shops to shop for clothes. Hitt and Jones offered to buy clothes for Byers, but he did not think it was right to spend the money of a man who they had killed.

Officer Pawlak testified that Jones showed the chain that he was wearing to him, and asked if it was considered a weapon. This exchange occurred after the murder but before the arrest.

Jones wrote letters from jail in which he apparently made admissions. Both Jones and Hitt had letters in their personal effects to and from each other. Hitt had a letter from her to Jones in a sealed envelope marked as legal mail. In the letter, Jones told Hitt to "Get yourself an envelope, write 'legal documents' on it. They're not allowed to look at your legal mail. Put it in there, and that way I'll get to see it." RT 3009 (prosecutor's closing argument quoting or paraphrasing letter).[3] In a letter Jones wrote a letter to Hitt's father, he stated, "I understand why you might be upset with me, but let me tell you, I did it. Tia had some small part in it. I had the upper hand." RT 3010 (prosecutor's closing argument quoting or paraphrasing letter). Jones wrote that he did it because he loved her – corroborating her statements to that effect. Jones wrote another letter in which he stated, "that kid was stupid for talking," referring to Matthew. RT 3010 (prosecutor's closing argument quoting or paraphrasing letter). Jones pleaded in letters for Hitt not to abandon him. In another letter, he wrote about getting evidence suppressed: "You know, if we get it suppressed, then we're going to have to change our stories. Then we'll have to say the exact opposite of what we've said so far." RT 3011 (prosecutor's closing argument quoting or paraphrasing letter).

Two inmates who encountered Jones at the county jail testified that Jones was trying to get messages to another witness to leave town. Inmate Dean Ammons testified that Jones told him to tell his girlfriend Jessica to get out of town. Inmate Robert Nielsen testified that Jones sent a message via him to tell Ammons to tell Jessica to get out of town. This activity by Jones reflects consciousness of guilt because Jessica was present with Byers when Jones was bragging in the homeless shelter that he or they had killed someone.

12

The prosecutor argued the evidence showed that there were four points at which premeditation was apparent. First, long before they encountered Blanton, Jones told Hitt he would kill to prove his love for her and discussed methods of killing people, with a particular interest in slitting throats. The killing suggested he finally found the opportunity to do so. Second, Hitt and Jones discussed Jones obtaining a skull for Hitt to use as a souvenir, like one she had seen in a headshop in Texas. Third, Jones killed in part because he believed he would go back to prison if it was discovered by police that he had failed to register as a sex offender, and Blanton had indicated he was going to the police when he tried to leave the campsite. Fourth, Jones' statement to Blanton that he was "not getting out of here alive" reflected deliberation and premeditation. The prosecutor also argued that Jones' employment of various methods and the amount of time Jones took to kill Blanton gave him time to choose whether to kill: the strangulation efforts by hand took about fifteen minutes, during which Jones fished about to try to find his knife to use on the victim, after which Jones switched to a chain to strangle Blanton, and finally used a rock to crush Blanton's head twice.

The trial record has a helpful detail on the trier of fact's thoughts, as the judge explained his verdict when he rendered it. Specifically, on the premeditation/deliberation point, he stated that Hitt's statements that Jones had said Blanton was going to die "give me an indication that you're weighing at least whether he's going to live or die in that area and whether he's going to leave that area alive." RT 3043-44. The judge noted that Hitt consistently had said that Jones said, "'I'm not going to let you leave out of here alive.'" RT 3044.

Jones urges that Byers' testimony as what Jones had said was subject to the rule that evidence of a defendant's oral admissions should be viewed with caution. Under the circumstances, that rule does not require much discounting of Byers' testimony. Jones bragged that he or they (meaning he and Hitt) had killed a man and followed up on his statements by showing the body of the victim and offering to spend on Byers some of the victim's money he found in the victim's bag. That suggests there was no misunderstanding or misrecollection by Byers as to what he heard from Jones. Until police were led to it,

13

Byers was the only person other than Hitt and Jones who had seen the dead body. The credibility of Byers' testimony was buttressed by Hitt's statements (corroborating that Jones had bragged in the breakfast line of the killing, that Jones had invited Byers to come to the campsite for a viewing, that they offered to buy things for Byers with the money they obtained from Blanton's possessions), by the evidence that Jones had made threatening comments trying to cause another witness in the breakfast line to leave town, and by the physical evidence (i.e., there actually was a dead body where he said he had seen it and the recently-killed body he saw had such severe damage to his face that Byers only figured out who it was by the missing hand. This is not a case where one has any doubts about whether a witness misunderstood or embellished what a defendant said.

Jones also urges that the physical evidence of the nature and extent of the injuries did not reflect premeditation because the injuries were "not large in number, consisting in effect of two severe head injuries, a minor head injury, a broken rib, and evidence suggesting attempted manual strangulation." AOB, p. 40. The court disagrees. These were extensive injuries that were far more suggestive of a preconceived intent to kill than a quick and reflexive killing. The employment of multiple means to try to kill Blanton reflected deliberation about the killing, as did the nature of the injuries. The killer had to change positions to inflict them, e.g., getting in a position to throw or drop a large boulder onto the victim's face more than once, getting in a position to try to strangle the victim, and getting in a position to break a rib. Also, of course, the physical evidence was corroborated by Hitt's description of the injuries inflicted on the victim, the methods used by Jones, and Jones' statements to Hitt.

It was the totality of the evidence – including the statements of several witnesses and the various pieces of physical evidence – and the cross-corroboration of so many details among several witnesses and between witness statements and physical evidence that put things in context and painted a clear picture of a murder done with premeditation and deliberation. Even though a confession is "like no other evidence" in its damaging effect, Fulminante, 499 U.S. at 296, Jones' conviction was a certainty with or without his

14

confession.

Jones also observes that in one of his admissible statements, he said he did not "mean to kill" the man. CT 1264. Traverse, p. 6. If one considers the statements he made that were not subject to the Miranda problem, the picture actually gets much worse for him. Most of those statements provided further corroboration for the prosecution's case. Jones' volunteered statements reflected a great deal of concern that Hitt had told authorities what he did, that there was a dead body, that he was in very serious trouble, and that Matthew may have told the police something that incriminated Jones. See CT 1241, 1259. His statement that he did not "mean to kill" is quite damaging as it indicates that he was the killer, even if it might have pointed away from a first degree murder conviction if believed. However, the self-serving statement of lack of intent to kill was simply not credible in light of this other evidence: the multiple methods used by Jones to kill Blanton, Jones' bragging about the killing and showing off the body, Hitt's recitation of the manner in which the killing occurred, Hitt's description of Jones' many statements indicating a premeditated and deliberate killing (i.e., Jones attacked after Blanton said he might contact the police, Jones wanted to get a human skull for Hitt, Jones feared apprehension as an unregistered sex offender, Jones was willing to kill for his fiancé, before he even began his attack Jones announced that Blanton was not getting out of the campsite alive, and Jones told Hitt to help find his knife so he presumably could slit Blanton's throat). Also, there was no evidence that the victim had any weapon, could have overpowered Jones and/or Hitt, or took any kind of aggressive steps while encountering Jones; to the contrary, the victim was attempting to comply with Jones' directive to leave the campsite when Jones attacked him. Under the circumstances, the "I didn't mean to kill him" evidence had absolutely no persuasive power as to Jones' mental state at the time of the killing.

The California Court of Appeal's rejection of Jones' Miranda claim as harmless error, if any, was not contrary to or an unreasonable application of clearly established federal law. Jones is not entitled to the writ on this claim.

B.  Confrontation Clause Claim

   1.  State Court Proceedings

Jones contends that his rights under the Confrontation Clause were violated by the admission of evidence of statements Matthew made to a police officer and to a nurse. Matthew was a 14-year old runaway who spent a night in the tent with Jones and Hitt. At the time of trial, Matthew was considered unavailable because he reportedly was outside the state and his parents would not let the prosecution communicate with him. The court admitted testimony from a police officer and a nurse as to certain statements Matthew had made.

Santa Cruz police officer Cline picked Matthew up at the Metro station for return to his parents and intended to drive him home. When he picked up Matthew, Jones and Hitt were nearby. At trial, officer Cline testified that, while he was driving Matthew home, "Matthew became upset and started to cry. Cline asked him what was wrong, and Matthew responded that the people he had spent the night with, [Jones] and Hitt, had raped him. Cline asked Matthew why he did not report this while they were at the Metro station. Matthew said that he was afraid to report the sexual assault because [Jones] and Hitt had said that they had killed someone." Cal. Ct. App. Opinion, pp. 16-17.

Christina Gonzales, a sexual assault nurse examiner for the County of Santa Cruz, testified that she examined Matthew on February 21, after he reported he had been raped. Gonzales testified that Matthew said he had been assaulted the night before, and "that he was afraid for his life, that the assailants had said that they had killed someone with a 'smiley,' and that they told him what a 'smiley' is. Matthew also said that the male assailant had told Matthew not to tell because he did not want to have to hurt Matthew." Cal. Ct. App. Opinion, p. 17. She also testified that Matthew cried a lot and appeared "very afraid and did not want to go home because he was afraid the assailants would find him and kill him." Id. Matthew later recanted his story that he had been raped. Other evidence was presented that he had consensual sexual activity with Hitt while Jones watched.

When the judge announced his verdict, he stated that although nurse Gonzales'

testimony had been admitted, he did not think it was of any importance. "I'll indicate for the record that in fact I did not consider it as part of my decision at this time. I don't believe – I understand that it was – at least I'm finding that it was admissible, but I think, based upon the other aspects of this case, that it had no real bearing in relation to my decision." RT 3044-3045.

On appeal, Jones contended that the trial court erred in admitting the statements under state law and also under the Confrontation Clause. As to the constitutional claim, the state appellate court determined that it did not need to determine whether the trial court erred under Crawford v. Washington, 541 U.S. 36 (2004), because any error was harmless.

> As stated above, the trial testimony and other evidence presented by the prosecutor that defendant does not contest on appeal amply supports the trial court's determination that defendant committed first degree murder. The evidence shows that even though Blanton attempted to walk away from defendant's campsite, defendant struck, kicked, and attempted to strangle Blanton with the intent to kill him. While Blanton was on the ground, defendant took a large piece of concrete and twice threw it on Blanton's head, crushing his skull and killing him. Defendant then dragged Blanton's body into the bushes and covered it up, and told several people other than Matthew about the killing. Given the nature of the other evidence of defendant's guilt, we conclude that any error in admitting Matthew's statement to Officer Cline that defendant and Hitt had told him that they had killed someone was not prejudicial.

Cal. Ct. App. Opinion, p. 20. The appellate court did not discuss nurse Gonzales' testimony about Matthew's statements to her because it "agree[d] with the Attorney General that, as the trial court stated that Gonzales's testimony did not contribute to the court's finding that defendant committed first degree murder, we need not discuss whether the testimony was properly admitted." Id. at 18.

    2.    <u>Analysis</u>

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. Crawford v. Washington, 541 U.S. 36, 61 (2004). The Confrontation Clause applies to all "testimonial" statements. See Crawford, 541 U.S. at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (citations and quotation marks

17

1 omitted); see id. ("An accuser who makes a formal statement to government officers bears

2 testimony in a sense that a person who makes a casual remark to an acquaintance does not.").

3 The Confrontation Clause applies not only to in-court testimony but also to out-of-court

4 statements introduced at trial, regardless of the admissibility of the statements under state

5 laws of evidence. Crawford, 541 U.S. at 50-51.

6 Confrontation Clause claims are subject to harmless error analysis. United States v.

7 Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also United States v.

8 Allen, 425 F.3d 1231, 1235 (9th Cir. 2005), cert. denied, 547 U.S. 1012 (2006). For

9 purposes of federal habeas corpus review, the standard applicable to violations of the

10 Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial

11 effect upon the jury. See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir.), cert. denied,

12 537 U.S. 851 (2002) (citing Brecht, 507 U.S. at 637).

13 Like the state court, this court finds that the admission of the evidence was harmless

14 error, if error at all. As to the evidence of statements made by Matthew to the SART nurse,

15 the trial judge specifically stated that he had not relied on that evidence. This makes it clear

16 that the evidence from the nurse did not have a substantial and injurious effect on the verdict.

17 The admission of evidence of statements Matthew made to the police officer also was

18 harmless error, if any. The statement was extremely similar to the one Jones made to Byers,

19 i.e., that he or they had killed someone. The evidence about Matthew's statement came in

20 with a concession that he had lied about being raped, which made his credibility doubtful and

21 would have made his statement less believable to the trier of fact. Also, because a murdered

22 body had been found, and Hitt and Byers provided far greater details about it, Matthew's

23 statement was far from being a significant part of the prosecution's case. Further, Matthew's

24 statement to police officer Cline did not even address the core dispute in this case of whether

25 Jones acted with deliberation and premeditation.

26 Regardless of whether the court looks at the impact of Matthew's statements and

27 Jones' confession individually or cumulatively, the result is the same: the evidence did not

28 have a substantial and injurious effect on the verdict. The California Court of Appeal's

rejection of Jones' Confrontation Clause claim as harmless error, if any, was not contrary to or an unreasonable application of clearly established federal law. Jones is not entitled to the writ.

## CONCLUSION

The petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 26, 2008

Marilyn Hall Patel
United States District Judge


# NOTES

1. The bicycle lock chain that was about 2-3 feet in length was referred to by several of the witnesses and counsel as a "smiley." The non-criminal use for it in this case was to secure a wallet on one end to a wearer's pants, keys or a clip on the other end.

Days after the murder, on February 17, 2002, Jones encountered Santa Cruz police community service officer Pawlak and asked if the smiley that he was then wearing could be construed as a weapon. Pawlak told Jones that, unless it was used as a weapon, it would be construed as part of his personal attire. Pawlak described the object as having two chains – a bicycle chain and another silver interlocking chain like one would get at a hardware store –attached to Jones' wallet on one end and a carabiner on the other end.

Pawlak identified exhibits 67 and 82 as looking like the same chains Jones was wearing the day he encountered Jones. RT 1854-54. Exhibit 67 was a plexiglass containing a bicycle chain seized from the tent by police officers. Exhibit 82 was the other chain.

2. Tia Hitt was an accomplice. Under California law, a conviction may not be based on the testimony of an accomplice unless it is corroborated by other evidence connecting the defendant with the commission of crime. Cal. Evid. Code § 1111. The federal standard is less stringent. Under federal law, "uncorroborated testimony of an accomplice is sufficient to sustain a conviction unless it is incredible or insubstantial on its face." United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993). The U.S. Supreme Court recognized long ago that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them." Caminetti v. United States, 242 U.S. 470, 495 (1917).

The prosecutor explained in her closing argument the evidence that corroborated Hitt's statements. Her statement that there was a body was corroborated by police finding the body at the location she described. The autopsy report that stated the victim's skull was crushed by a heavy object corroborated her statements of a rock being dropped on the victim's head, as did the blood on the rock in the area of the killing. The autopsy report's statement that there were markings consistent with manual strangulation corroborated her statement that Jones tried to strangle Blanton with his hands and then with the chain. Byers' testimony about the bragging by Jones corroborated her statements about the murder. Officer Pawlak's testimony that Jones was observed wearing the chain after the murder corroborated Hitt's statements. The DNA evidence of Blanton's blood on that chain corroborated Hitt's statement that it had been used in the killing. Jones' possession of a post office box key and Blanton's use of a post office box corroborated Hitt's statements. The evidence that Blanton did have funds corroborated her statement that they found $1300 in Blanton's bag. The hotel receipt corroborated Hitt's statement that she rented the room for two people the night after the murder. Jones' letters corroborated her statements. The records from Texas corroborated her statements that Jones thought there was a warrant for his arrest and he had failed to register as a sex offender in Texas.

3. The letters are not in the record submitted to this court.